**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas Harold DOBSON,**
**Defendant-Appellant.**

**No. 79–5363**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1980.

As Modified on Denial of Rehearing
March 19, 1980.

---

* Fed.R.App.P. 34(a);  5 Cir. R. 18.

Bruce V. Griffiths, Houston, Tex. (court-appointed), for defendant-appellant.

Shirley Baccus-Lobel, Richard H. Stephens, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, RUBIN and POLITZ, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This is a sad case of a government employee gone astray. We review the facts in the light most favorable to the prosecution, as we must in view of his conviction. Mr. Dobson was employed by the Department of Energy as an auditor. He had done audit work on Pride Refining, Inc., in 1977. On October 20, 1978, he submitted his resignation, effective November 4, 1978. A supervisory auditor asked him to explain the Pride audit and his work papers. After a conference, the supervisory auditor asked Dobson to submit a memorandum showing what he had and had not done concerning Pride, his calculations as to whether Pride was guilty of a minimum pricing violation, and his conclusions and rationale. The memo was for official DOE review of the Pride case, and Dobson was asked to prepare it as part of his duties.

Dobson last actually worked on November 3, but his resignation was not official until November 4. On Saturday afternoon, November 4, he phoned Pride's executive vice-president, and arranged a meeting. At the meeting he told Pride's official that he had just quit the DOE and wanted to work as a consultant on DOE matters. He also told the official that he had been asked to submit a memo that would reflect favorably on Pride so that it would not be prosecuted criminally. He asked for a retainer and said he needed financing to start his consulting business.

After communicating with the FBI, the Pride official arranged further meetings with Dobson. Eventually Dobson prepared a memorandum incorporating changes suggested by Pride, ostensibly designed to avert criminal action. In return the Pride official paid him $1,000 and promised to lend him $20,000 to $30,000 thirty days later provided no criminal action had been taken

against Pride. Dobson delivered the memo dated November 3 to the DOE on November 16. It was signed by him as "auditor in charge of referral."

He was charged with violation of 18 U.S.C. § 201(g), which makes it a criminal offense if a "public official, former public official, or person selected to be a public official . . . directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value . . . for or because of any official act performed or to be performed by him." He was convicted and sentenced to two years imprisonment.

■ Dobson's first contention is that the report he made on November 16 was not an official act because, when it was made, he was not a public official; he could perform an official act only while he was still employed by the government. The argument is superficially appealing, but the statute shows it to be beside the point. The statute defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may *at any time be pending,* or which may by law be brought *before any public official, in his official capacity, or in his place of trust or profit."* 18 U.S.C. § 201(a) (emphasis added).

Responsibility for the Pride audit memorandum was in Dobson's hands prior to the end of his official employment, while he was still capable of performing an official act. He worked on it before he officially resigned; his decision to wait until after the end of his official employment to reduce his work to writing is not controlling. The indictment charged that the official act he performed was "the preparation and submission of a memorandum concerning Pride Refining, Inc." The various tasks summed up in the word "preparation" were performed during the entire period from the time he was assigned to the case until November 16, when he submitted the memorandum. Both the preparation of the report and its final submission were official acts within the meaning of Section 201(a). We need not

decide whether that section would embrace conduct that was initiated only after employment had ceased.

The indictment charged that he solicited and accepted something of value "[o]n or about November 16" while he was a "former public official." The statute expressly includes within its scope former as well as current public officials and expressly reaches the solicitation or receipt of value for official work performed in the past. As we said in *United States v. Evans,* 5 Cir. 1978, 572 F.2d 455, 479, *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182, to be found guilty of accepting a thing of value for official conduct, "it is not necessary . . . that the official actually be capable of providing some official act as *quid pro quo* at the time." *See also Blunden v. United States,* 6 Cir. 1948, 169 F.2d 991, 994. To hold that the statute did not reach the bold solicitation described here would be to expose departing federal employees to valedictory temptations.

■ It was not error for the trial court to charge the jury that 10 C.F.R. § 203.10(4) (1978) prohibits a DOE employee from receiving any salary or supplementation of his government salary from a private source, as compensation for his services to the government. Whether or not Dobson was on the payroll when the report was written, the essential element of the substantive crime charged was solicitation by a public official in return for an official act. The challenged regulation was relevant to show the requirements to which appellant was held in his official conduct as a DOE official. *See United States v. Morlang,* 4 Cir. 1975, 531 F.2d 183, 191–92.

■ At trial, Dobson was permitted to submit the defense of entrapment. He complains that the court's instruction, distinguishing between "legal" and "illegal" entrapment was confusing, and therefore reversible error. The short answer is that, since there was no evidence of government involvement at the time Dobson first sought out a Pride official, the evidence was insufficient even to raise the question

of entrapment. There was no evidence whatever tending to show government inducement or Dobson's lack of predisposition to commit the offense charged. *See United States v. Wolffs,* 5 Cir. 1979, 594 F.2d 77, 80; *Pierce v. United States,* 5 Cir. 1969, 414 F.2d 163, 165–69, *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425. Hence, the giving of the charge, even were it error to include such phrases as "lawful entrapment" and "unlawful entrapment," did not prejudice appellant's rights. *See United States v. Dukes,* 5 Cir. 1973, 479 F.2d 324, 326.

■ Finally, Dobson contends that the judge abused his sentencing discretion by imposing the maximum sentence allowable under 18 U.S.C. § 201(g), because of his mistaken belief that Dobson was guilty of the more serious offense of bribery, under 18 U.S.C. § 201(c). It is not necessary for us to decide whether the sentence could be set aside had the judge been mistaken and had the sentence been imposed solely because of an erroneous belief that Dobson had committed such an uncharged crime. Even if we assume a matter on which the record is not entirely clear, that the judge imposed the maximum sentence only or largely because he thought Dobson could have been convicted of bribery, that belief has not been shown to have been erroneous. Because Dobson was still a public servant on November 4, the day he solicited Pride's officer, he might indeed have been convicted of a bribery offense under 18 U.S.C. § 201(c). Moreover, if the judge had an erroneous view at the time of sentencing, Fed.R.Crim.P. 35 permits the defendant to seek reduction of sentence within 120 days of the time this judgment becomes final for any reason, whether by appeal to dismiss or by the marshalling of facts to alter the judge's view.[1] No abuse of discretion is shown.

There having been no prejudicial error, the conviction is AFFIRMED.

[1] We are aware that the sentence was imposed by the late Judge Leo Brewster who, after a distinguished career as a district judge, died on November 27, 1979. This does not preclude reduction of the sentence by another judge if reason for reduction can be shown. By saying this, of course, we do not intimate any belief that the sentence is or is not appropriate.