**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 97-30251

(Summary Calendar)
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOANN A PARKER; RALPH PARKER,

Defendants - Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana

January 15, 1998

Before WIENER, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Joann A. Parker ("Mrs. Parker") appeals her conviction and sentence for conspiracy to commit public bribery and five counts of public bribery in violation of 18 U.S.C. §§ 201(b)(2)(C) and 371. Ralph Parker ("Mr. Parker") appeals his conviction for conspiracy to commit public bribery and three counts of public bribery under the same statutes.  We affirm.

I

The Social Security Administration ("SSA") Office of Hearings and Appeals employed Mrs. Parker as a clerk to Administrative Law

Judge ("ALJ") John Aronson. She led a group that helped certain individuals to fraudulently obtain Supplemental Security Income ("SSI") benefits in return for money.[1] The scheme began when Mrs. Parker met Niknitta Simmons ("Simmons") at a hearing where Simmons was appealing the denial of SSI benefits for her son, Kevin Simmons. ALJ Aronson advised Simmons that additional documentation would be necessary for a favorable ruling on Kevin's claim. Mrs. Parker approached Simmons after the hearing and offered to help. A few days later, Mrs. Parker gave Simmons a letter approving Kevin's benefits. Mrs. Parker thereafter called Simmons and demanded money for her help. Simmons refused to pay, and Kevin's benefits were terminated. Mrs. Parker advised Simmons that Kevin's benefits would be reinstated if Simmons paid her.

Simmons went to several SSA offices and reported Mrs. Parker's demands. Investigators from the SSA and FBI contacted Simmons, and she agreed to assist them by permitting FBI Agent Karen Jenkins to record her telephone conversations with Mrs. Parker. In multiple recorded conversations, Mrs. Parker demanded payment for having Kevin's benefits approved initially and for having those benefits reinstated. At a meeting at Simmons' home, Mrs. and Mr. Parker took $500, as captured on videotape by the FBI. Mrs. Parker

---

[1]     SSI benefits are means-based benefits for needy elderly, blind, and disabled persons. An applicant for SSI first fills out an application for benefits at a local SSA office. If the initial application is denied, then the applicant may reapply. After the application has been denied twice, an applicant may appeal to the SSA Office of Hearing and Appeals, where an ALJ will review the file and, if necessary, order a hearing. The ALJ will issue a written opinion granting or denying SSI benefits, a copy of which is mailed in a letter to the applicant. The ALJ also may determine that the disability began at some prior point in time and order a lump-sum back payment.

thereafter demanded more money, which Simmons paid, and Mrs. Parker gave Simmons a letter purportedly bearing ALJ Aronson's signature reinstating Kevin's benefits.

Agent Jenkins and a SSA agent interviewed Mrs. Parker about her contacts with Simmons. The agents advised Mrs. Parker of her rights and she signed a written waiver before confessing to fraudulently approving benefits for Kevin Simmons, Raymond Henry, Georgette Lemon, Yvette Scott, and Karen Johnson. Mrs. Parker stated that two other SSA employees had assisted her and implicated Mr. Parker. Mrs. Parker admitted that she had approved benefits by taking letters addressed to different persons, changing the names and dates of those letters to match those of the applicants who had paid her money, and forging the signature of ALJ Aronson.

II

A

Mrs. Parker first argues that the indictment charging her with conspiracy to commit public bribery and public bribery under 18 U.S.C. § 201(b)(2)(C) was deficient because she lacked the authority to grant or deny benefits. Mrs. Parker's duties included assisting ALJ Aronson before and during the hearings, recording and taking notes at those hearings, and typing and mailing ALJ Aronson's decisions. Mrs. Parker had access to the office's computer system, but was not authorized to approve benefits or sign ALJ Aronson's name. Thus, Mrs. Parker essentially argues that the only acts which we should examine in determining whether she violated section 201(b)(2)(C) are those within the scope of her

authority, such as typing and mailing opinions.

Section 201(b)(2)(C) prohibits public officials from being induced to do or omit any act in violation of their official duty.[2] Acts that violate an official's duty are extremely broad in scope. Section 201(a) broadly defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). This broad definition of "official act" reflects Congress' intent to "include any decision or action taken by a public official in his capacity as such." S.Rep. No. 87-2213, (1962), *reprinted in* 1962 U.S.C.C.A.N. 3852, 3856. Official acts that violate an official's official duty are not limited to those proscribed by statutes and written rules and regulations, but may also be found in "established usage," because "duties not

---

[2]     18 U.S.C. § 201 provides in relevant part:

(b) Whoever))
. . .
    (2) being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
    . . .
        (C) being induced to do or omit any act in violation of the official duty of such official or person.
    . . .
shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

*Id.*

-4-

completely defined by written rules are established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery." *United States v. Birdsall*, 233 U.S. 223, 231, 34 S. Ct. 512, 514, 58 L.Ed.2d 930 (1914). Official acts that violate an official's official duty are also not limited to those within the official's specific authority. *See e.g., United States v. Gjieli*, 717 F.2d 968, 972 (6th Cir. 1983).

Mrs. Parker does not dispute that the individuals for whom she fraudulently approved benefits had appeals pending in her office. Because the appeals were pending in her "place of trust or profit," her actions fall within the statutory definition of "official act." *See United States v. Dobson*, 609 F.2d 840, 842 (5th Cir. 1980) (holding that the actions of a government employee in preparing a memorandum fell within the definition of an "official act" because the decision in question was pending in his "place of trust or profit"). Her abuse of the SSA facilities and equipment and the responsibility that ALJ Aronson gave her enabled her to alter and forge the decisions. Mrs. Parker could create fictitious letters approving benefits because she had access to the official networked computer system. She was able to "cut and paste" segments of one document onto another and make them appear real. As access to government computer systems becomes more prevalent, opportunities for this kind of nefarious behavior will become more common. We therefore hold that the term "official act" encompasses use of governmental computer systems to fraudulently create documents for

the benefit of the employee or a third party for compensation, even when the employee's scope of authority does not formally encompass the act. *See e.g., United States v. Carson*, 464 F.2d 424, 433 (2nd Cir. 1972) (interpreting the bribery statute broadly to cover a congressional aide's attempts to intercede with Executive Branch officials on behalf of bribers even though the scope of his job authority did not extend to such intercession). Mrs. Parker's actions were thus covered by section 201(b)(2)(C) and the indictment was not deficient.

B

Mr. and Mrs. Parker argue that the district court erred in barring cross-examination of the witness Yvette Scott on pending state charges that Scott murdered her husband. At trial, they both argued that the charge was relevant to show Scott's general lack of credibility. The court barred mention of the pending state charges because it held that "[t]hreatening to kill her husband or killing her husband has nothing to do with the facts of this case." On appeal, Mrs. Parker argues that cross-examination should have been allowed to show Scott's lack of credibility. Mr. Parker argues for the first time on appeal that such cross-examination would have shown that Scott had an incentive to slant her testimony in this case in favor of the government to receive a favorable recommendation in the pending state case.

As the lower court correctly noted, FED. R. EVID. 609 permits impeachment by evidence of past convictions, but does not apply to crimes charged for which there has been no conviction. *See United*

*States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir. 1989) (holding that an arrest is generally not admissible to impeach the general credibility of a witness). Prior bad acts that have not resulted in a conviction are admissible under FED. R. EVID. 608(b) if relevant to the witness's character for truthfulness or untruthfulness. Violent crimes, however, are irrelevant to a witness's character for truthfulness. *See* CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6118 (1993). Accordingly, the district court did not abuse its discretion denying cross-examination to show Scott's general lack of credibility, and we reject Mrs. Parker's argument.

With regard to Mr. Parker's argument that cross-examination on the pending state charges would have demonstrated possible bias, even assuming the applicability of Rule 608(b), reversal would still not be required. Mr. Parker has presented no evidence that federal prosecutors agreed to give a favorable recommendation for or intercede on behalf of Simmons in the pending state case. *See United States v. Benavidez*, 664 F.2d 1255, 1262 (5th Cir. 1982) (holding trial court's refusal to allow impeachment of a witness's credibility on pending state charges did not violate the Confrontation Clause because no evidence existed of any deal between the government and witness to testify favorably). Moreover, any error that may have occurred was harmless. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S. Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). Scott's testimony was substantially corroborated by the testimony of Georgette Lemon and other

government witnesses.  Thus, even if the trial court erred in not allowing cross-examination on the pending state charges to demonstrate possible bias, such error was harmless, and we reject Mr. Parker's argument as well.

C

Mrs. Parker next argues that the district court erred in excusing venire member 47, who stated that he would have a "healthy skepticism for evidence brought into court" and that he would be suspicious of the government's evidence before he saw it.  She also avers that the judge's questioning of venire member 47 was so loud that the entire venire could hear the questioning, and that this questioning cowed the jury into believing that they were required to accept the government's evidence as correct.

In noncapital cases, removal of a venire member generally is not grounds for reversal unless "the jurors who actually sat were not impartial within the meaning of the Sixth Amendment."  *United States v. Gonzalez-Balderas*, 11 F.3d 1218, 1222 (5th Cir. 1994). A potential juror is properly excused for cause when the individual's views would prevent or substantially impair the performance of their duties as a juror.  *See United States v. Flores*, 63 F.3d 1342, 1354 (5th Cir. 1995).  In addition to stating that he had a "healthy skepticism" for evidence, venire member 47 stated that he would be suspicious of the evidence before he had seen it based on his brother-in-law's recent criminal conviction. Therefore, the court did not abuse its discretion in dismissing venire member 47.

Mrs. Parker has presented no evidence that the jurors who

actually sat were not impartial.  Indeed, even after the judge's exchange with venire member 47, other venire members approached the bench to inquire about possible disqualifications.  Their exchanges with the judge do not reflect any sense of intimidation by the judge's exchange with venire member 47.  The judge also instructed the jury that they should decide the case only on the evidence presented in court and according to the court's instructions.  In the absence of evidence to the contrary, we find that the jury was impartial, and that Mrs. Parker's rights were not prejudiced.  *See United States v. Prati*, 861 F.2d 82, 87 (5th Cir. 1988).

D

Mr. Parker argues that the district court abused its discretion on two evidentiary rulings. We review evidentiary rulings only for abuse of discretion. *See United States v. Torres*, 114 F.3d 520, 526 (5th Cir. 1997).  In the first ruling, FBI Agent Jenkins testified that "As soon as I arrived [at Simmons' house], I learned that Mrs. Parker had just called Simmons and demanded money."  The trial court allowed the statement to be introduced only for the limited purpose of establishing background information on why Agent Jenkins began the investigation, a use which we have repeatedly approved in the past.  *See e.g., United States v. Carillo*, 20 F.3d 617, 619 (5th Cir. 1994) (allowing testimony of detective concerning background information that led detectives to purchase drugs from defendant).  The court also gave two limiting instructions to the jury explaining that the statement was not

admitted for the truth of the matter asserted.[3]  Thus, the district court did not abuse its discretion in admitting this statement.

In the second ruling, Peggy Kelly testified about a telephone conversation she had with a man who referred to Mrs. Parker as his "old lady" and who threatened Kelly.  Kelly stated that she thought that the man on the telephone was Mr. Parker and her reasons for so thinking, but admitted that she could not identify his voice and that she had never previously met him.  Mr. Parker argues that the government therefore failed to properly establish the evidentiary foundation for the telephone conversation. "While a mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity, some additional evidence, which 'need not fall in[to] any set pattern,' may provide the necessary foundation." *United States v. Khan*, 53 F.3d 507, 516 (2nd Cir. 1995) (quoting FED. R. EVID. 901(b)(6), Advisory Committee notes, example 6).

Here, the trial court found sufficient circumstantial evidence to indicate that the man on the telephone was Mr. Parker because Mrs. Parker placed the call to Kelly, and, thereafter, a man interrupted the telephone conversation and stated that Mrs. Parker was his "old lady."  Based on this circumstantial evidence, we affirm the district court's finding that the government established

---

[3]     Even assuming that the prejudicial effect of this statement substantially outweighed its probative value, see FED. R. EVID. 403, and that the district court erred in admitting it, such error was harmless because Simmons herself repeated this information in her testimony and the government played recorded tapes of those conversations to the jury. *See United States v. Gomez*, 529 F.2d 412, 417 (5th Cir. 1976) (holding admission of hearsay statement to be harmless error because contents of statement were duplicated by other evidence).

a foundation for the conversation.  Once the government established this foundation, it became the province of the jury to decide whether Mr. Parker was indeed the man on the phone and whether he made the threats; as the conversation was relevant to this determination, it was properly admissible under FED. R. EVID. 401.  Accordingly, we reject Mr. Parker's argument.

E

Mrs. Parker argues that the evidence was insufficient to support her conviction.  Because she failed to move for a judgment of acquittal at the close of the evidence, we review only for plain error.  *See United States v. McCarty*, 36 F.3d 1349, 1358 (5th Cir. 1994).  A conviction may be reversed under the plain error standard only to avoid a manifest miscarriage of justice.  *Id.*  "Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc).  After a thorough review of the record, we find that the record is not so devoid of evidence pointing to guilt or so tenuous on a key element of the offense that her conviction would be shocking and, accordingly, we decline to reverse her conviction.

F

Finally, Mrs. Parker alleges various errors in her sentencing and the court's adoption of the Presentence Report ("PSR").  We review the trial court's legal interpretation and application of sentencing guidelines *de novo* and its factual findings in

connection with sentencing for clear error. *See United States v. Ismoila*, 100 F.3d 380, 394 (5th Cir. 1996). Facts contained in a PSR are considered reliable and may be adopted without further inquiry if the defendant fails to present competent rebuttal evidence. *See United States v. Puig-Infante*, 19 F.3d 929, 943 (5th Cir. 1994). Such rebuttal evidence must demonstrate that the PSR information is "materially untrue, inaccurate or unreliable," *see United States v. Angulo*, 927 F.2d 202, 205 (5th Cir. 1991). Mere objections do not suffice as competent rebuttal evidence. *See Puig-Infante*, 19 F.3d at 943.

Mrs. Parker first argues that the court erred in considering the confession she made to Agent Jenkins in deciding her sentence. We reject this argument because the statement was admissible and was introduced at trial. *See United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994). Moreover, at sentencing, "a court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3 (Nov. 1995).

Mrs. Parker next alleges that the district court erred in crediting the part of the PSR that stated that Mrs. Parker took $8,000 from Peggy Kelly's sister in the bathroom of a Wendy's restaurant for obtaining benefits. We reject her argument because she failed to present any rebuttal evidence to support her argument. Moreover, the jury convicted Mrs. Parker on one count of taking money from Peggy Kelly's sister and therefore, the court

-12-

only adopted what the jury had previously determined.

Mrs. Parker alleges that the victim impact portion of the PSR is deficient because it overstates the victim impact. She argues that the only victims in this case were the individuals from whom she took money and only their payments to her should be considered in affixing the amount of the loss. The PSR identified the SSA as the victim, stated that the total fraudulent claims amounted to $69,673.85, and broke down the claims by each individual, which the district court as being both accurate and reliable. Loss calculations will be affirmed so long as they reasonably estimate the loss using reasonably available information. *See* U.S.S.G. § 2F1.1, cmt. 8; *United States v. Chappell*, 6 F.3d 1095, 1101 (5th Cir. 1993). Mrs. Parker failed to present any rebuttal evidence and while the individuals from whom Mrs. Parker extorted money may have been victims, the SSA was also a victim because it paid monies due to Mrs. Parker's actions that it otherwise might not have paid. *Cf. United States v. Sidhu*, No. 96-50736, 1997 WL 745724, at *8-9 (5th Cir. Dec. 3, 1997) (holding that for doctor's fraud, the victim impact should include not just amounts collected from patients, but amounts collected from insurance companies as well). Therefore, we reject Mrs. Parker's argument.

Mrs. Parker also argues that the district court erred in increasing her offense level under U.S.S.G. § 2B3.2 based on its finding that her offense involved threats of physical injury and

property destruction.[4]  A conspirator may be held liable for the substantive offenses of a coconspirator when the acts are reasonably foreseeable and are done in furtherance of the conspiracy, even where the first conspirator lacked knowledge of or participation in the acts.  *See Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946).  The trial court found that the threats were made by Mr. Parker, but that the threats were attributable to Mrs. Parker because they were coconspirators and his actions were reasonably foreseeable by her.  Absent competent rebuttal evidence, the court properly adopted these facts.  U.S.S.G. § 1B1.3(a)(1)(B).

Mrs. Parker argues that the district court erred in increasing her offense level pursuant to § 3B1.1(c) of the Guidelines for her leadership role.  We review this sentence enhancement only for clear error, *see United States v. Narvaez*, 38 F.3d 162, 166 (5th Cir. 1994), and no clear error results if the finding is plausible in light of the record read as a whole.  *See United States v. Watson*, 966 F.2d 161, 162 (5th Cir. 1992).  The record of this case and testimony by government witnesses at trial fully supports the district court's finding that Mrs. Parker exercised a leadership role in altering SSA documents. *See* U.S.S.G. § 3B1.1, cmt. 4.

Finally, Mrs. Parker argues that the court erred in failing to consider her medical condition and her financial circumstances in imposing her sentence and ordering her to pay restitution, citing U.S.S.G. § 5H1.4 and § 5E1.2.  We reject this contention because

---

[4]  Violation of § 201(b)(2)(C) is normally punishable under U.S.S.G. § 2C1.1, but if the offense involved a threat of physical injury or destruction, U.S.S.G. § 2B3.2 is instead applied.

the district court considered her medical condition and financial circumstances before imposing the sentence and it explicitly declined to reduce her sentence. *See United States v. Winters*, 105 F.3d 200, 208 (5th Cir. 1997); *United States v. Guajardo*, 950 F.2d 203, 208 (5th Cir. 1991).

III

The convictions of Joann Parker and Ralph Parker are AFFIRMED and the sentence of Joann Parker is AFFIRMED.